616 A.2d 84

**Barbara L. BLUE, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 3, 1992.

Decided Sept. 21, 1992.

Reargument Denied Nov. 10, 1992.

Alexander W. Banks, for petitioner.

Harry A. Flannery, for respondent.

Before McGINLEY and FRIEDMAN, JJ., and SILVESTRI, Senior Judge.

FRIEDMAN, Judge.

Barbara L. Blue (Claimant) appeals from an order of the Unemployment Compensation Board of Review (UCBR) affirming a referee's determination that Claimant was ineligible for unemployment compensation benefits pursuant to section

402(e) of the Pennsylvania Unemployment Compensation Law, Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 802(e).[1]   We reverse.

The referee's findings, fully adopted by the UCBR, reveal that Claimant was employed by the Pennsylvania Power Company (Employer) as a teller/clerk when, in February 1991, she was diagnosed as having a left indirect inguinal hernia, requiring surgery.   In anticipation of this operation, scheduled for March 6, 1991, Claimant left work on February 28, 1991, having informed her supervisor of her medical problem and impending surgery.

On March 11, 1991, at Employer's request, Claimant submitted a doctor's excuse from her treating physician, Louis Lyras, M.D.;  the note stated only that Claimant would "be unable to return to work till after surgery recovery."  (Employer exhibit 2).   Employer found this excuse unacceptable because it was not dated and it failed to provide adequate information regarding Claimant's physical condition.   As a means of obtaining the required information, Employer sent Claimant a company form to be completed by her physician. On this form, Dr. Lyras indicated that Claimant would be totally disabled, unavailable to perform even light duty work, from February 28, 1991 until April 22, 1991.

Employer remained dissatisfied.   Believing that six weeks was an excessively long recovery period for this type of surgery, Employer requested Claimant's authorization to contact Dr. Lyras, which Claimant denied.[2]  Employer then asked

---

1.  This section of the Act provides in pertinent part:
    An employe shall be ineligible for compensation for any week—
    . . . .
    (e) In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work, . . .

2.  Although he had received the completed form from Dr. Lyras, Claimant's supervisor testified that he felt it necessary to pursue the matter further in order to fulfill his managerial responsibilities.  He stated that this was Employer's busiest time of year and there was already a staff shortage;  therefore, he hoped that Claimant could return to work earlier than the date specified on the form.  Because the supervisor was aware of other hernia recoveries that were of much shorter duration, he

Claimant to submit to an examination by the company physician, so that he could evaluate Claimant's ability to return to a light duty post before the April 22, 1991 date set by Dr. Lyras. Following this examination, the company doctor advised Employer that Claimant's blood test and x-rays were normal, but that he could not provide conclusive evidence about Claimant's condition unless he talked to Claimant's treating physician to determine whether there had been any complications with her surgery. Claimant again refused to permit any consultation with Dr. Lyras, and on April 5, 1991, the company doctor, based solely on his own examination, declared Claimant fit to perform light duty work.[3]

On this same date, Claimant's supervisor instructed Claimant to report back to work by April 8, 1991; however, Claimant refused to follow this directive because she had not yet been released for work by Dr. Lyras. As a result of this refusal, and because she twice denied Employer permission to discuss her condition with her surgeon, Claimant was suspended effective April 5, 1991. Claimant's suspension was converted to a discharge on April 8, 1991.

The Office of Employment Security granted Claimant's application for unemployment compensation benefits and Employer appealed. Following evidentiary hearings, the referee reversed, disallowing benefits based on section 402(e) of the Act. The referee reasoned that although Claimant had good cause for refusing to report for work on April 8, 1991, because she had not received clearance from her personal physician to return to her duties, she failed to establish good cause for her lack of cooperation. The referee concluded that it was willful misconduct for Claimant to refuse Employer permission to discuss her physical condition with Dr. Lyras when Employer

sought Claimant's release to discuss Claimant's medical records with her surgeon. In addition, he wanted to contact Dr. Lyras directly in order to ensure that the doctor understood the nature of the light duty arrangement which was available to Claimant. (N.T. 8–9).

3. Claimant's job as full-time teller/clerk, a position which primarily involved sitting at a teller window eight hours per day, was considered to be light duty work. Thus, Employer expected Claimant to resume her former duties upon her return to work.

was faced with conflicting medical opinions regarding Claimant's ability to perform light duty work. The UCBR affirmed and Claimant now appeals to this court.[4]

Although not specifically defined in the Act, willful misconduct has been interpreted as an act of wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rules, a disregard of the standards of behavior which the employer has a right to expect of an employee, or negligence indicating an intentional disregard of the employer's interests or of the employee's duties and obligations to the employer. *Lee Hospital v. Unemployment Compensation Board of Review*, 139 Pa.Cmwlth.Ct. 28, 589 A.2d 297 (1991). Whether an employee has been discharged for willful misconduct is a question of law subject to review by the court. *Waltz v. Unemployment Compensation Board of Review*, 111 Pa. Cmwlth.Ct. 54, 533 A.2d 199 (1987).

■ An employee's deliberate refusal to comply with his employer's request can constitute willful misconduct, depending upon the reasonableness of the request and the reasonableness of the refusal. *Behe v. Unemployment Compensation Board of Review*, 78 Pa.Cmwlth.Ct. 524, 467 A.2d 1208 (1983); *Devine v. Unemployment Compensation Board of Review*, 59 Pa.Cmwlth.Ct. 318, 429 A.2d 1243 (1981). When the employer's request is deemed reasonable, a claimant still can avoid a conclusion of willful misconduct by establishing good cause for his refusal. *Frumento v. Unemployment Compensation Board of Review*, 466 Pa. 81, 351 A.2d 631 (1976). To determine if good cause existed for employee's action, we must evaluate the suitability of the employer's request, in light of all attendant circumstances, as well as the employee's reasons for noncompliance. If an employer's request is reasonable in the context of the particular employ-

4. Under section 402(e), the employer bears the burden of proving willful misconduct. Where the party bearing this burden has prevailed below, our scope of review on appeal is limited to determining whether an error of law has been committed, or whether necessary findings of fact are unsupported by substantial evidence. *Kretsch v. Unemployment Compensation Board of Review*, 83 Pa.Cmwlth.Ct. 169, 476 A.2d 1004 (1984).

ment relationship and the employee's refusal is unjustified, such conduct evidences a disregard of the standards of behavior an employer expects of his employees. *Kretsch v. Unemployment Compensation Board of Review*, 83 Pa.Cmwlth.Ct. 169, 476 A.2d 1004 (1984).

■ Claimant argues that her actions did not constitute willful misconduct because Employer's request was not reasonable under the circumstances here.[5] Claimant contends that because she complied with three prior demands from Employer—providing it with two separate written doctor's excuses and submitting to a physical examination by the company doctor—she was not uncooperative; in fact, she more than satisfied her responsibilities under Employer's official attendance policy.[6] In view of the fact that she had fulfilled, and even exceeded, her obligations to Employer, Claimant asserts that it was unreasonable for Employer to demand that she take additional steps, such as signing a release to allow the company's doctor to talk to her treating physician.

Claimant relies on *LeGare v. Unemployment Compensation Board of Review*, 498 Pa. 72, 444 A.2d 1151 (1982) to support her position. In *LeGare*, our Supreme Court reversed this court's affirmance of a UCBR order disallowing unemployment compensation benefits to an employee based on section 402(e). The employee, while on sick leave, complied with her employer's sick leave policy by providing the employer with a

5. We agree with the referee and UCBR that Claimant had good cause for refusing to follow Employer's directive to return to her job before her treating physician had released her for work. Therefore, for our determination here, we consider only the reasonableness of Employer's request that Claimant permit it access to Dr. Lyras, and the reasonableness of Claimant's refusal to grant this permission.

6. When hired, employees received a three page pamphlet entitled Employee Attendance Policy. Included in the information regarding attendance, the pamphlet outlined several steps for employees to follow when they were unable to work. In such cases, employees were required to: contact their supervisor as soon as possible to report an absence due to illness or personal injury; make advanced arrangements for absences due to reasons other than personal injury or illness; provide a doctor's statement explaining the illness or injury when the supervisor requested it; and, if the absence was an extended one, provide the supervisor with regular reports on their condition. (Claimant's exhibit 1).

certificate stating that she was under doctor's care and would remain out for an indefinite period. In addition, the employee forwarded additional verification from her doctor when the employer requested it. However, the employer still felt it had not received conclusive medical information regarding its employee's condition and the expected duration of her absence. Consequently, it informed employee that she was expected to report for a physical examination by employer's physician to determine her health status. The employee's refusal to submit to this examination was viewed as an unjustified failure to comply with a reasonable request of the employer, disqualifying her from benefits due to willful misconduct within the meaning of section 402(e).

In its reversal, the Court in *LeGare* determined that the employer had deviated from its written sick leave policy by asking its employee to submit to the examination, and without competent evidence justifying that deviation, the employee's failure to comply with the request must be deemed reasonable. Claimant contends that the same result is required in this case. She asserts that the issues in *LeGare* are identical to those here because both cases involve an employee's refusal to comply with an employer demand that was outside the scope of the employer's policy.

On the other hand, Employer contends that *LeGare* is not identical, or even applicable, to the facts here. Employer argues that its request was not a deviation from policy, but actually was covered by company policy. Alternatively, Employer asserts that even if its request exceeded the scope of its policy, it had provided the justification for deviation that *LeGare* requires.

As evidence that its request was within the scope of its official policy, Employer points out that Claimant, as part of her application for employment, agreed to submit to a physical examination at the discretion of Employer and to abide by the medical findings of Employer's physician.[7] We acknowledge

7. As part of its application for employment, Employer includes a section entitled AGREEMENT, which states in pertinent part:
   If selected for employment, I understand and agree:

the existence of Employer's application policy as well as its attendance policy; however, we conclude that only the latter applies to the situation here.

First, we believe that the application policy serves a different purpose than the policy regarding employee attendance. As part of the application process, Employer requires a medical examination to ascertain a prospective employee's fitness for the specific job for which he or she has applied. In the specified instances requiring re-examination of existing employees, the same information is sought for employees resuming their duties. Clearly, the purpose of the application agreement is to safeguard Employer's interests and the health of its employees by preventing employees from attempting to perform duties beyond their physical capabilities. Given this purpose, we cannot construe the application policy to require employees in Claimant's circumstances to ignore the advice of their treating physician and return to work prematurely. Moreover, an employer policy that made this demand, would

1. That I may be given a physical examination at the expense of the Company (where job requirements make it necessary) and that the physician's report is to become a part of this application.

2. That I shall submit to a physical examination, at Company expense, at any time at the discretion of the Company; and that I shall be governed by the report of the examining physician and the opinion of the Company regarding my physical ability to perform the duties to which assigned at such time or any other duties that I may believe I am physically capable of performing.

(Employer's exhibit 8).

In a procedure letter to its personnel department, accompanied by written guidelines for its application, Employer addresses these physical examinations in greater detail. According to these communications, new applicants for employment must have at least a general physical; however, those seeking physically demanding jobs must undergo other appropriate examinations to ascertain their fitness for such positions. The letters also state that re-examination of current employees would be appropriate in certain instances to determine their fitness to resume their duties following an absence due to: A. serious personal illness or injury (such as heart attack, stroke, mental or nervous disorder, and injury or illness related to major joints or the back); B. leave of absence; C. excessive absenteeism (to ensure that employee is able to perform the full duties of the job); D. industrial injury; and E. a period of suspension (particularly when employee was suspended as unfit for duty).

(Employer's exhibit 9).

be unreasonable on its face.[8]   Therefore, in applying *LeGare* to the circumstances here, we consider only Employer's attendance policy.

To properly analyze this issue, we feel it necessary to address each of Claimant's two refusals individually.   As to Employer's first request to speak to Claimant's physician, we hold that the request was beyond the scope of Employer's attendance policy, without justification for the deviation. Claimant had fully complied with her responsibilities under the attendance policy;   she informed her supervisor of her upcoming surgery in advance and provided Employer with two statements from Dr. Lyras, the second one on the company's own form.   Yet Employer wanted more.

At the hearing, Claimant's supervisor testified that in asking for a release to discuss Claimant's medical records and return to work with her surgeon, all he sought from Dr. Lyras was a simple "yes she can or no she can't answer."   (N.T. 18). That is precisely what Claimant, through her physician's note, had already provided.   We believe that there was nothing left to ask;   Dr. Lyras already had indicated a specific date for Claimant's return, and stated clearly that she could not perform even light duty work before that date.   Thus, despite its claim that it "didn't have enough information to reach a conclusion" (N.T. 9), Employer had all the information it needed, all it claimed to want, and all that was required.   The desire to second guess Dr. Lyras' evaluation of Claimant's condition did not justify Employer's demands for more. Therefore, under the *LeGare* analysis, Claimant's first refusal cannot be considered willful misconduct.

Following the first refusal, Employer demanded that Claimant submit to a physical examination from the company's own

8.   The referee reaches this same conclusion.   Although the referee's findings include the fact that Claimant signed this application agreement (referee finding of fact No. 3), the referee ultimately determined that Claimant had good cause to refuse to report for work before receiving permission from her own doctor.   In reaching this conclusion, the referee indicates that the application agreement either is inapplicable in Claimant's situation, or if applicable, it is an unreasonable policy.

physician. Although she had already fully satisfied the dictates of the attendance policy, Claimant agreed. Ironically, her compliance makes Claimant's second refusal a more difficult question because, as a result of his examination, Employer's physician released Claimant to return to work.

At first blush, it appears that there is nothing inherently unreasonable about Employer's second request to speak with Dr. Lyras, even if it goes beyond the normal requirements of the written attendance policy. Because Employer was now faced with two different medical opinions regarding Claimant's readiness to resume her duties following surgery, it seems understandable that Employer wanted the opportunity to consult with both doctors in order to make an informed decision on the matter. In fact, it was precisely this analysis which formed the basis for the referee's conclusion of willful misconduct.[9]

However logical this analysis may seem, it ignores an important point. Only one event alters the circumstances between Claimant's first and second refusal; the later refusal followed Claimant's examination by Employer's doctor. It is the existence of two medical opinions which seems to provide Employer with the justification for deviation from policy required by *LeGare*. However, we cannot forget that without Claimant's cooperation, a second medical opinion would have been unavailable to Employer. If, as we have indicated, it would have been reasonable for Claimant to refuse to submit to this examination, it would be absurd to deny her benefits

---

**9.** The referee concluded that "claimant has failed to establish good cause for refusing permission of the employer to discuss her physical condition with the [doctor] *when the employer was faced with two conflicting medical opinions concerning the claimant's ability to perform light duty work."* (Referee's decision, 3) (emphasis added).

We note that although the referee stated that Employer was faced with two "conflicting" medical opinions, we believe that Employer actually had one unequivocal and one equivocal medical opinion, which did not necessarily conflict. Dr. Lyras' opinion was unequivocal, stating that Claimant could not return before April 22, 1991, even to light duty. On the other hand, Employer's doctor equivocated, basing his opinion only on his own examination of Claimant, with the caveat that a conclusive statement regarding her condition could not be rendered before consulting with her surgeon.

because, having submitted, she provided Employer with the means to make her second refusal unreasonable. We have held that because Employer's first request was unjustifiably outside the scope of its own policy, Claimant's noncompliance was reasonable. Where Claimant cannot be faulted for remaining within the scope of an employer's policy, she certainly should not be penalized for going beyond policy requirements.

This result is consistent with the remedial purpose and humanitarian objectives of the Act, of which we must be ever mindful. *LeGare.* Claimant's motive for refusing to accede to Employer's requests may mystify us. However, under *LeGare,* it cannot be considered unreasonable, and so cannot be deemed willful misconduct under section 402(e). Accordingly, we reverse.

## ORDER

AND NOW, this 21st day of September, 1992, the order of the Unemployment Compensation Board of Review is reversed and this case is remanded to the UCBR for computation of benefits.

SILVESTRI, Senior Judge, dissenting.

The majority analyzes the reasonableness of Employer's request to Claimant for permission to speak to her surgeon and the reasonableness of Claimant's refusal to grant permission. If Employer's request was reasonable and Claimant's refusal was not reasonable, a finding of willful misconduct may be made. *Kretsch v. Unemployment Compensation Board of Review,* 83 Pa.Cmwlth.Ct. 169, 476 A.2d 1004 (1984). Whether an employee has been discharged for willful misconduct is a question of law subject to review by this court. *Waltz v. Unemployment Compensation Board of Review,* 111 Pa. Cmwlth.Ct. 54, 533 A.2d 199 (1987). The referee and the Board found that Employer proved willful misconduct on Claimant's part, and our scope of review is limited to determining whether an error of law was committed or necessary findings of fact are unsupported by substantial evidence. *Kretsch.*

I believe the majority has exceeded our scope of review, under the guise of reviewing the finding of willful misconduct as a question of law, by imposing its own interpretation of the reasonableness of Employer's request rather than reviewing the record for substantial evidence to support the finding that such request was reasonable. Because I find that the record supports a finding that Employer's request was reasonable, and, further, that Claimant's refusal was unreasonable, I dissent.

The record contains, *inter alia,* Claimant's application for employment and Employer's pamphlet entitled "Employee Attendance Policy." The majority finds that Employer's application policy is not applicable to the situation here (op. p. 548–50) but proffers no reason for its determination. I disagree. The application contains an agreement which states:

If selected for employment, I understand and agree:

1. That I may be given a physical examination at the expense of the Company (where job requirements make it necessary) and that the physician's report is to become a part of this application.

2. That I shall submit to a physical examination, at Company expense, *at any time at the discretion of the Company;* and that I shall be governed by the report of the examining physician and the opinion of the Company regarding my physical ability to perform the duties to which assigned at such time or any other duties that I may believe I am physically capable of performing.

(Employer's exhibit 8) (Emphasis added.)

Claimant clearly agreed to submit to a physical examination, at any time at the discretion of Employer, and to be governed by the report of the examining physician. In the present case, Employer's examining physician found Claimant's condition to be normal but he desired to speak to Claimant's surgeon in order to determine if there were complications resulting from Claimant's surgery. (Referee's Finding of Fact No. 11.) Since Claimant refused this request, Employer's physician, based on his own examination and his findings therefrom, released Claimant for light duty work. I believe that Employ-

er's request that Claimant be examined by a company physician was reasonable and was, in fact, agreed to by Claimant. Likewise, Claimant agreed to be governed by the report of the examining physician. The examining physician was not required to consult with Claimant's surgeon before rendering his opinion as to Claimant's condition, although he desired to do so in this instance.

In Employer's attendance policy, it provides:

Recognizing that perfect attendance is not always possible, it is the employee's responsibility to do the following:

Contact your supervisor (or designated person) as soon as possible in cases of personal injury or illness, or when you know you are going to be late for work. If you can't personally contact your supervisor, have someone do it for you;

Make advance arrangements with your supervisor for absences for reasons other than personal injury or illness;

Provide a statement from your doctor explaining the illness or injury when requested by your supervisor; and

In the case of an extended absence, regularly report to your supervisor on your condition.

(Claimant's exhibit 1.)

Here, Claimant followed the first requirement by informing her supervisor of her expected absence. The second requirement is inapplicable. The third and fourth requirements are applicable to Claimant's situation. Claimant did provide two statements from her surgeon; however, the statements do not "explain the illness or injury." The first statement explained simply "Barbara will be unable to return to work till after surgery recovery." (Employer's exhibit 2.) Dissatisfied, Claimant's supervisor asked for a second statement on a company form. On that statement, item 3 states: "She will be totally disabled and prevented from performing the normal tasks of her job from ___ to ___" upon which Claimant's surgeon filled in the dates February 28, 1991 [1] and April 22, 1991.

---

1. Claimant's surgery was performed on March 6, 1991; there was no explanation as to why Claimant was required to be off work between February 28 and March 6, 1991.

(Employer's exhibit 3.) The surgeon also indicated that Claimant could not perform light duty work. Employer questioned the six-week period and sought permission of Claimant in order to allow Employer to speak to her surgeon and to explain to her surgeon the nature of the light duty work they were offering to her. (N.T. p. 9.) Claimant refused to permit Employer to contact or speak with her surgeon. I disagree with the majority that Claimant "fully satisfied the dictates of the attendance policy" (op. p. 551) and the majority's use of that determination as support for making findings contrary to those of the referee and the Board.

I believe the record supports a finding that Employer's request was reasonable and that Claimant was unreasonable in her refusal to grant permission to Employer to speak to her surgeon regarding her condition, and I would affirm the Board.